# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

MARLAINA A. NAPOLI-BOSSE et al.,
    *Plaintiffs*,

v.

GENERAL MOTORS LLC,
    *Defendant*.

No. 3:18-cv-1720 (MPS)

## RULING ON MOTION TO DISMISS

**I.    INTRODUCTION**

The Plaintiffs in this case allege that their GMC Acadias suffer from a defect that prevents them from turning off and locking their cars, making it unsafe for them to leave their vehicles and, in effect, stranding them in their cars. General Motors LLC ("GM") has moved to dismiss all claims. As set forth below, GM's motion to dismiss the claims of the non-resident Plaintiffs for lack of personal jurisdiction is GRANTED. Plaintiffs Rilla Jefferson, Brandy Smith, and Mark Riley have failed to allege any connection between their claims and the state of Connecticut. Consequently, this Court lacks personal jurisdiction over GM with respect to their claims.

Plaintiff Marlaina Napoli-Bosse—the only plaintiff whose claim arose in this State—brings claims for breach of warranty and breach of contract. GM's motion to dismiss her claims is GRANTED in part and DENIED in part. GM's New Vehicle Limited Warranty does not constitute an express warranty under Connecticut law. Napoli-Bosse's breach of express warranty claim must therefore be dismissed, along with her derivative breach of warranty claim under the Magnuson-Moss Warranty Act. Napoli-Bosse has plausibly alleged, however, that

1

GM failed to live up to its contractual obligations by failing to repair the alleged defect within a reasonable period of time. Her breach of contract claim thus survives.

## II.     GM'S MOTION TO DISMISS UNDER RULE 12(B)(2)

### A.     Legal Standard

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). To survive a motion to dismiss, a plaintiff need only provide "legally sufficient allegations of jurisdiction." *Id*. A plaintiff makes such a showing through "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id*. at 567 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Plaintiff's jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 341 (S.D.N.Y. 2015) (quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993)).

There are three requirements that must be met in order for a court to exercise personal jurisdiction: "First, the plaintiff's service of process upon the defendant must have been procedurally proper. Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective. . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)). In order to assure that the last prong has been satisfied, a court must determine both "whether a defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction over the defendant and whether the assertion of personal jurisdiction over the defendant comports with traditional notions of fair play and

2

substantial justice under the circumstances of the particular case." *Johnson v. UBS AG*, 791 Fed. Appx. 240, 242 (2d Cir. 2019) (internal quotation marks omitted) (citing Waldman, 835 F.3d at 331).

"With respect to minimum contacts . . . a distinction is made between 'specific' jurisdiction and 'general' jurisdiction." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir.2010). "Specific jurisdiction exists when 'a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum.'" *Id*. (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8 (1984)). "A court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id*.

**B.**  **This Court Lacks Personal Jurisdiction over GM as to the Claims by Non-Resident Plaintiffs**

GM argues that this Court lacks personal jurisdiction over it as to the claims asserted by the non-resident plaintiffs, namely, Plaintiffs Brandy Smith of Texas, Rilla Jefferson of Tennessee, and Mark Riley of Ohio.[1] Plaintiffs do not argue that this Court has general jurisdiction over GM. GM asserts that this Court also lacks specific jurisdiction over GM as to the claims brought by the non-resident Plaintiffs under the Supreme Court's decision in *Bristol-Meyers Squibb v. Superior Court of Cal., S.F. Cty.*, 137 S. Ct. 1773 (2017).

In *Bristol-Meyers Squibb*, "[a] group of plaintiffs—consisting of 86 California residents and 592 residents from 33 other States" brought a mass tort action in California state court alleging injuries caused by a drug manufactured by Bristol-Myers Squibb. 137 S.Ct. at 1777-78.

---

[1] Plaintiff Samuel Taylor of Kentucky has withdrawn all his claims. ECF No. 23 at 8 n.1.

Bristol-Myers Squibb challenged the California state court's exercise of specific jurisdiction as to the claims of the non-resident plaintiffs, none of whom asserted any connection between their claims and the state. *Id*. at 1777-80, 1782. Applying "settled principles regarding specific jurisdiction," the Supreme Court held that the California state court's exercise of specific jurisdiction as to the non-residents' claims violated the Due Process Clause of the Fourteenth Amendment because there was no "connection between the forum and the [non-residents'] specific claims." *Id.* at 1781. "The mere fact that *other* plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* at 1781.

GM contends that a straight-forward application of *Bristol-Myers* requires the dismissal of the non-resident Plaintiffs' claims. These plaintiffs have not alleged any facts suggesting that their particular claims arise out of GM's contacts with the state of Connecticut. They have not alleged, for example, that GM developed, manufactured, or created a marketing strategy for their vehicles in Connecticut, nor that they purchased their vehicles in Connecticut or viewed advertisements in the state.

The Plaintiffs argue that *Bristol-Myers* does not apply because that case involved a state—not federal—court, and was motivated by considerations of interstate federalism inapplicable here. *See, e.g.*, *id.* at 1780 (Restrictions on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States."); *id.* at 1780-81 ("[E]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another state; even if the forum State has a strong interest in applying its law to the

controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism may sometimes act to divest the State of its power to render a valid judgment."). The *Bristol-Myers* court noted, moreover, that it "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 1784.

The parties do not point to any Circuit Court decision addressing whether *Bristol-Myers* applies to federal courts, and I am aware of none. But the vast majority of district courts to have addressed the question have concluded that *Bristol-Myers* does govern actions in federal courts. *See, e.g.*, *Chufen Chen v. Dunk' Brands, Inc.*, 2018 WL 9346682, at *5 (E.D.N.Y. Sept. 17, 2018) (applying *Bristol-Myers* to require each named plaintiff in a purported class action "to show that in-state contacts specific to their claim give rise to specific jurisdiction over an out-of-state defendant," and indicating that "[t]his reading of *Bristol-Myers* comports with the weight of district court authority on the subject"); *Lugones v. Pete and Gerry's Organic, LLC*, 2020 WL 871521, at *4 (S.D.N.Y. Feb. 21, 2020) (applying *Bristol-Myers* to dismiss non-resident named plaintiffs in a class action in federal court); *Spratley v. FCA US LLC*, 2017 WL 4023348 (N.D.N.Y. Sept. 12, 2017) (same); *Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 125-26 (D.D.C. 2018) (same).

This conclusion also follows from Second Circuit precedent indicating that where a plaintiff's assertion of personal jurisdiction "rests upon a state long-arm statute, the relevant constitutional constraints are those imposed by the Due Process Clause of the Fourteenth Amendment." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012). This Court's personal jurisdiction over GM can only rest on Connecticut's long-arm statute, because the Magnuson-Moss Warranty Act (MMWA) does not authorize nationwide

service.  *See Chen*, 2018 WL 9346682 at *4 ("Neither CAFA nor the [MMWA] permits nationwide service of process."); *see also* Rule 4(k)(1) (listing the statutory bases for effective service).  Thus, the relevant constitutional constraints are those imposed by the Fourteenth Amendment.[2]  This renders inapposite the Supreme Court's qualification that it "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court," *Bristol-Myers Squibb*, 137 S. Ct. at 1784, and I see no reason why a straightforward application of *Bristol-Myers* does not follow.

Plaintiffs cite a single out-of-circuit District Court case holding that an extension of *Bristol-Myers* to federal courts is unwarranted, because *Bristol-Myers* "was animated by unique interstate federalism concerns."  *Sloan v. General Motors LLC*, 287 F. Supp. 3d 840, 858 (N.D. Cal. 2018).  But that decision did not consider the distinction between claims as to which personal jurisdiction stems from statutory authorization for nationwide service and those as to which personal jurisdiction stems from a state's long-arm statute.  In light of this, I do not find *Sloan* persuasive, at least as it might apply to the circumstances of this case.[3]  I therefore join the majority of district courts to consider the issue and conclude that, because the non-resident Plaintiffs have failed to allege that their claims arise out of GM's contacts with Connecticut,

---

[2] By contrast, where the relevant statute does authorize nationwide service, the relevant constitutional constraints are those of the Fifth Amendment.  *See, e.g.*, *U.S. S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 544 (S.D.N.Y. 2013).

[3] In a subsequent decision issued in the same case, after all federal claims had been dismissed and only state-law claims remained, the Court concluded that, in light of the "growing weight of authority . . . *Bristol-Myers* applies to federal courts sitting in diversity, and thus the exercise of pendent personal jurisdiction is improper in such a circumstance."  *Sloan v. General Motors LLC*, 2019 WL 6612221, at *9 (N.D. Cal. Dec. 5, 2019).  Courts that have reached this conclusion have noted that "federal courts routinely apply the specific jurisdiction analysis to defendants in cases that are before them solely on the basis of diversity."  *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 2017 WL 4224723, at *4 (N.D. Cal. Sept. 22, 2017).  Just as Courts apply the Fourteenth Amendment's specific jurisdiction analysis when sitting in diversity, so too in federal question cases where the relevant statute has not authorized nationwide service.  *See Licci*, 673 F.3d at 60.

6

*Bristol-Myers* precludes this Court from exercising personal jurisdiction over their claims. The claims of Plaintiffs Brandy Smith, Rilla Jefferson, and Mark Riley are therefore DISMISSED.[4]

### III. GM'S MOTION TO DISMISS UNDER RULE 12(B)(6)

#### A. Factual Allegations

On February 27, 2017, Plaintiff Marlaina A. Napoli-Bosse leased a new 2017 GMC Acadia from Stephen Cadillac GMC, Inc. ("Stephen GMC"), an authorized GM dealership in Bristol Connecticut. ECF No. 16 ("Am. Compl.") ¶ 39. Stephen GMC assured Napoli-Bosse that the vehicle was accompanied by GM's New Vehicle Limited Warranty and was itself free from defects of workmanship. *Id.* at ¶ 40. Although Napoli-Bosse initially wanted to purchase her leased 2014 GMC Acadia at the conclusion of that lease, Stephen GMC convinced her to lease a new 2017 GMC Acadia, claiming it had more safety features, better gas mileage, and was a better overall vehicle. *Id.* Napoli-Bosse agreed to lease a new 2017 GMC Acadia as she needed a reliable vehicle to get to work and to drive her children. *Id.* at ¶ 41. The vehicle came with a New Vehicle Limited Warranty, which included the following terms:

> GMC will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions, and limitations.
>
> **Warranty Applies**
>
> This warranty is for GMC vehicles registered in the United States and normally operated in the United States and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> **Repairs Covered**

---

[4] To be clear, I do not reach the question of whether, in light of *Bristol-Myers Squibb*, this Court would have personal jurisdiction over GM with respect to the claims of non-resident, absent class members, in the event that a class were certified. Any such inquiry would be premature at this stage. *See Lugones*, 2020 WL 871521, at *4 ("[T]he Court will not at this stage in the litigation dismiss the claims of *potential* class members who may [be non-residents]." (citing cases)); *Chen*, 2018 WL 9346682, at *5 n.5 (noting that "Courts have divided on whether Bristol-Myers extends to unnamed plaintiffs in class actions," but declining to address the question prior to class certification).

7

> The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.
>
> * * *
>
> **Obtaining Repairs**
>
> To obtain warranty repairs, take the vehicle to a GMC dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

*Id.* at ¶ 35.

On or about July 20, 2018, Napoli-Bosse drove her child to day care. *Id.* at ¶ 43. As she attempted to shut off her car, the "Shift to Park" message on the vehicle's instrument cluster appeared, even though the vehicle's shift lever was in the "Park" position, preventing Napoli-Bosse from shutting off her vehicle. *Id.* Unable to shut off her car and not willing to be late for day care, Napoli-Bosse left her vehicle on and unlocked. *Id.* at ¶ 44.

Because of this defect, Napoli-Bosse took her vehicle to Stephen GMC on or about July 20, 2018, to complain and to request a repair. *Id.* at ¶ 45. Stephen GMC acknowledged the shifter defect but advised there was no fix available and did not attempt to make any repair. *Id.* at ¶ 46. Around the same date, Napoli-Bosse called GM and complained about the shifter defect. *Id.* at ¶ 47. A GM representative told her that GM was working on a solution but had no timetable as to when a solution would be available. *Id.* On August 9, 2018, Napoli-Bosse, through her counsel, sent a letter to GM advising it that her Acadia suffered from the shifter defect and still had not been repaired. *Id.* at ¶ 52. In the meantime, concerned about being stranded in her vehicle, Napoli-Bosse refrained from driving her vehicle for several weeks and did not resume driving it until late August. *Id.* at ¶ 48.

After she resumed driving her vehicle, Napoli-Bosse experienced the shifter defect on numerous occasions and found herself stranded insider her vehicle at home, at work, and at various other places away from home, unable to shut her vehicle off. *Id.* at ¶ 49. To shut her vehicle off, Napoli-Bosse was forced to continuously wiggle the shifter, repeatedly move the shifter from "Park" to other gear positions and back to "Park," and repeatedly start and stop the vehicle's engine until her vehicle would recognize it was in "Park." *Id.* at ¶ 50. On one occasion, Napoli-Bosse was unable to shut off her vehicle while at home and sent her children with her husband home while she stayed in the car fiddling with the gear shifter. *Id.* at ¶ 51.

**B.     Legal Standard**

In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). In considering such a motion, the court must construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, "[a]fter the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1 (S.D.N.Y. Apr. 9, 2010). "When a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims, it is appropriate to grant

defendants['] motion to dismiss." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

**C.     Discussion**

Plaintiff Napoli-Bosse brings a breach of contract claim, ECF No. 16 at ¶¶ 105-11, a breach of express warranty claim under Connecticut law, ECF No. 16 at ¶¶ 120-28, and a breach of warranty claim under the MMWA, ECF No. 16 at ¶¶ 112-19.[5]  I analyze each claim in turn.

**1.     Napoli-Bosse's Breach of Express Warranty Claim**

A plaintiff asserting a claim for breach of express warranty must show (1) the existence of the warranty; (2) a breach of the warranty; and, (3) damages proximately caused by the breach. *McConologue v. Smith & Nephew Inc.*, 8 F.Supp.3d 93, 114 (D. Conn. 2014). An express warranty is defined by Connecticut statute as:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

Conn. Gen. Stat. § 42a-2-313(1).  This definition of "express warranty" is taken verbatim from the Uniform Commercial Code.  *See* UCC § 2-313.

Napoli-Bosse's vehicle came with a "New Vehicle Limited Warranty," which provided "for repairs to the vehicle during the warranty period" "to correct any vehicle defect . . . due to materials or workmanship occurring during the warranty period."  Am. Compl. ¶ 35.  The warranty further provided that "[r]easonable time must be allowed for the dealer to perform

---

[5] Napoli-Bosse does not plead a breach of implied warranty claim, unlike several of the non-resident Plaintiffs. *See* ECF No. 16 at ¶¶ 129-42.

10

necessary repairs." *Id.* GM argues that this Limited Warranty does not constitute an express warranty under Connecticut law.

Courts in other jurisdictions have split over whether a warranty promising only to repair any defects—as opposed to a warranty guaranteeing the absence of any defects—constitutes an "express warranty." Some courts have held that repair-and-replace warranties are not "express warranties" under statutory provisions with identical language. *See, e.g.*, *Mydlach v. DaimlerChrysler Corp.*, 226 Ill. 2d 307, 321-22 (Ill. 2007) (warranty promising that the manufacturer will repair or replace defective parts during the warranty period is not an "express warranty" under the UCC, because "[t]he UCC makes plain that an express warranty is related to the quality or description of the goods"); *Gernhardt v. Winnebago Industries*, 2003 WL 23976324, at *3 (E.D. Mich. Dec. 30, 2003) (language providing that repair was the sole remedy for any defect was not an "express warranty" under the Michigan statute based on UCC § 2-313); *see also* 2 Hawkland UCC Series § 2-725:2 ("[A] repair-or-replace promise is not an express warranty as defined in Section 2-313."). Other courts have come to the opposite conclusion. *See, e.g.*, *Watson & Son Landscaping, Partners v. Power Equipment Co.*, 2003 WL 22326967, at *4 (Ct. App. Tenn. Apr. 29, 2003) (promise to repair an excavator's hydraulic system was an "affirmation of fact or promise made by the seller to the buyer which relate[d] to the goods and [became] part of the basis of the bargain," and thus an "express warranty"); *Goddard v. General Motors Corp.*, 60 Ohio St.2d 41, 44 (Oh. 1979) (a "fair reading" of warranty promising to "repair any defective or malfunctioning part of the vehicle" created an "express" warranty under Ohio statute based on UCC § 2-313); *Woolums v. National RV*, 530 F. Supp. 2d 691, 697 (M.D. Pa. 2008) (repair-or-replace warranty is an "express warranty" for purposes of Pennsylvania analogue of UCC § 2-313); *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (finding

that the Michigan Supreme Court would likely interpret a repair-or-replace warranty to be an express warranty under the Michigan analogue of UCC § 2-313).

The Connecticut Supreme Court has not addressed this particular issue, and thus my task is to predict what it will decide when it does. *Travelers Ins. Co. v. 633 Third Associates*, 114 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."). A Connecticut Supreme Court decision addressing the status of repair-and-replace clauses in the context of a different statutory provision, also taken from the UCC, provides a solid basis to make such a prediction. Under the provision at issue in *Flagg Energy Dev't Corp. v. General Motors Corp.*, 244 Conn. 126 (1998), if "a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance," then the statute of limitations runs from "when the breach is or should have been discovered." Conn. Gen. Stat. § 42a-2-725(2); *see also* Uniform Commercial Code § 2-725. For other types of warranties—such as representations as to the present condition or characteristics of the goods—the statute of limitations runs from "when tender of delivery is made." *Id.* In *Flagg Energy*, the Connecticut Supreme Court rejected the plaintiffs' argument that the more generous accrual provision of Section 2-725 applied, holding that "the repair or replacement clause contains no terms that, as a matter of law, would constitute an explicit warranty of future performance . . . ." 244 Conn. 126, 150 (1998). The Court explained that "the [repair or replacement] clause describes no more than a contractual commitment by the defendant, for a limited period of time, to provide remedies additional to those provided by article 2 of the Uniform Commercial Code." *Id.*; *see also Meier v. Daimler Chrystler Co., LLC*, 2008 WL 2252539, at *4 (Conn. Super. Ct. May 7, 2008) ("[T]he warranties

that the plaintiff relies upon provided that the defendant would repair certain defective items on the plaintiff's vehicle at no charge to the plaintiff, if the defect arose during the time specified therein. None of the warranties contain language that amount to an explicit representation as to the future performance of the vehicle or any part thereof. The warranty that applies to the transmission does not state, for example, that the defendant warrants that the vehicle's transmission will not break down for at least eight years. Instead, it states that if the transmission breaks down within eight years, the defendant will repair or replace it.").[6]

The scope of the relevant clause in Section 2-725 is, however, narrower than the scope of Section 2-313. It creates an exception to the usual accrual rule for those express warranties that "extend[] to future performance of the goods and [where] discovery of the breach must await the time of such performance." Conn. Gen. Stat. § 42a-2-725(2). Thus, a warranty could fail to trigger this clause, but still constitute an "express warranty," such as an explicit representation that a used car has been accident-free. But closer examination of the Connecticut Supreme Court's reasoning in *Flagg* indicates that it would likely join those courts that have found repair-and-replace warranties to fall outside of the scope of UCC § 2-313. The Court explained its conclusion as follows:

> In the event of defects in the engines, the clause describes no more than a contractual commitment by the defendant, for a limited period of time, to provide remedies additional to those provided by article 2 of the Uniform Commercial Code. It is irrelevant that the plaintiffs have attached a warranty label to the clause. Putting a warranty tag on a nonwarranty clause will no more change its essential character than calling a bull a cow will change its gender. In light of its plain language, we conclude that the clause cannot be construed either as a new

---

[6] Courts in other jurisdictions have split as to whether a repair-or-replace warranty falls within the scope of the relevant clause in UCC § 2-725. *Compare Painter v. General Motors Corp.*, 974 P.2d 924, 926-27 (Wyo. 1999)(GM warranty providing for future repairs was not an "express warranty" under Wyoming statute based on UCC § 2-725) *with Nationwide Ins. Co. v. General Motors Corp./Chevrolet Motor Div.*, 533 Pa. 423, 434 (1993) (warranty promising to repair any defects "explicitly extends to future performance of the goods" under Pennsylvania statute based on UCC § 2-725).

13

>   warranty of performance or as an additional commitment for future performance
>   of other implied or express remedies.

*Flagg Energy Development Corp.*, 244 Conn. at 150 (internal quotation marks, citation, and alterations omitted). This analysis is based on the conclusion that a repair-and-replace clause is not a warranty at all, and not on the narrower conclusion that it does not "extend[] to future performance of the goods." Because this reasoning is equally applicable to whether a repair-and-replace clause is an "express warranty" under Section 2-313, I predict that the Connecticut Supreme Court will join those courts that have found § 2-313 to exclude repair-and-replace clauses. I thus find that GM's limited warranty is not an express warranty under Conn. Gen. Stat. § 42a–2–313(2). Because Napoli-Bosse has failed to allege the existence of an "express warranty," her claim for breach of express warranty is DISMISSED.[7]

**2.      Napoli-Bosse's Claim Under the Magnuson-Moss Warranty Act**

The parties agree that any claim under the MMWA stands or falls with the underlying state-law claims. *See* ECF No. 21 at 16-17; ECF No. 23 at 24 ("Finally, 'claims under the Magnuson-Moss Act stand or fall with the express and implied warranty claims under state law.'" (quoting *Cali v. Chrysler Grp. LLC*, 2011 WL 383952, at *4 (S.D.N.Y. Jan. 18, 2011)). In light of Napoli-Bosse's agreement that her MMWA breach of warranty claim is wholly derivative of any state law claims, the Court has no occasion to consider whether any language in the MMWA creates a separate cause of action, independent of state law. Because Napoli-Bosse's sole state-law breach of warranty claim has been dismissed, her derivative MMWA claim is also DISMISSED.

---

[7] Because GM's limited warranty is not an express warranty, I do not address GM's other arguments as to the breach of express warranty claim.

14

### 3. Napoli-Bosse's Breach of Contract Claim

Napoli-Bosse alleges that GM failed to repair the defect in her vehicle within a reasonable period of time, in violation of its contractual obligations under the New Vehicle Limited Warranty. Am. Compl. ¶¶ 105-08.

### a. Whether Napoli-Bosse Alleged Adequate Pre-Suit Notice

GM argues that Napoli-Bosse failed to provide sufficient pre-suit notice of her breach of contract claim. ECF No. 21-1 at 20. Under Connecticut law, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." Conn. Gen. Stat. § 42a-2-607(3)(a). "Complaints as to the quality of goods furnished may be found to constitute a sufficient notice of a breach . . . . But that can be true only where the complaints under all the circumstances of the case are such as reasonably to apprise the seller that the buyer intends to claim damages for the breach." *Western Dermatology Consultant, P.C. v. VitalWorks, Inc.*, 146 Conn. App. 169, 182 (2013) (quoting *Truslow & Fulle, Inc. v. Diamond Bottling Corp.*, 112 Conn. 181, 189 (1930)).

Napoli-Bosse alleges that she called GM and complained about the alleged defect. Am. Compl. ¶ 47. She also alleges that, in August of 2018, she sent a letter to GM, through her counsel, "advising it that [her vehicle] suffered from the Shifter Defect and still had not been repaired." Am. Compl. ¶ 52. Because the August 2018 letter is expressly referenced in the complaint, because it was allegedly sent to GM, and because Napoli-Bosse attaches it to her opposition brief, I may consider its contents for purposes of ruling on this motion. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" and that "[e]ven where a document is not incorporated by

15

reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint" (internal citations and quotation marks omitted)). The letter, dated August 9, 2018, states the "defects in the vehicle constitute a breach of warranty and Connecticut Lemon Law," that the vehicle had been "presented for repair on multiple occasions" but that "the same defect continues to exist," that the defect "substantially impair [the vehicle's] use, value, and safety to [our] client," and that "[w]e will file a lawsuit in this case unless [the matter] is settled within 30 days." ECF No. 23-2 at 2. This broad language forecloses GM's argument that the plaintiff has failed to "provide notice that the defendant is in breach of an applicable warranty." ECF No. 21-1 at 16. The letter is easily sufficient to put GM fairly on notice that the plaintiff believed it to be in breach of its promise to repair any defects within a reasonable time.

**b.     Whether the New Vehicle Limited Warranty Covers the Alleged Defect**

GM next argues that GM's limited warranty does not apply to design defects. ECF No. 21-1 at 18. Although it appears there is case law supporting GM's contention that a limited warranty covering defects due to "materials or workmanship" does not cover design defects, *see, e.g.*, *Amato v. Subaru of Am., Inc.*, 2019 WL 6607148, at *5 (D.N.J. Dec. 5, 2019) (citing cases), I need not resolve this question, because Napoli-Bosse has adequately alleged a "materials or workmanship" defect. The allegations in the Amended Complaint describe the defect from a consumer's perspective. They do not speak to the genesis of the defect, of which a plaintiff cannot be expected to have any knowledge prior to discovery. While there may be some defects where the answer to this question is obvious from the nature of the alleged defect, that is not the case here.

GM argues that because Napoli-Bosse alleged that "all class vehicles" suffer from the alleged defect, Am. Compl. ¶ 19, she has necessarily alleged a design defect, and not a manufacturing defect. ECF No. 21-1 at 19 (citing *Gertz v. Toyota Motor Corp.*, 2011 WL 3681647, at *10 (C.D. Cal. Aug. 22, 2011); *Bruce Martin Const., Inc. v. CTB, Inc.*, 2012 WL 6203112, at *4 (E.D. Mo. 2012)). While some District Courts appear to have relied on this inference at the motion to dismiss stage, *see, e.g.*, *Gertz*, 2011 WL 3681647, at *3, I decline to do so here. On a motion to dismiss, the Court must draw all reasonable inferences in favor of the plaintiff. *Chambers*, 282 F.3d at 152. It is certainly possible that a defect affecting all 2017 and 2018 Acadias stemmed from a design decision made by GM. But it is also possible that such a defect was caused by a deficiency in the process through which all of these Acadias were manufactured, or from an incorrect or defective material provided by one of GM's suppliers, contrary to the design specification. To make the former inference in favor of GM would be to invert the motion to dismiss standard.

In short, it is simply not possible for this Court to know the genesis of the alleged defect at this stage. Thus, I join those Courts that have declined to dismiss a complaint where it is not yet apparent whether the alleged defect is a manufacturing or a design defect. *See, e.g.*, *In re Volkswagen Timing Chain Product Liability Litigation*, 2017 WL 1902160, at *12 (D.N.J. May 8, 2017) ("Courts within this district have refused to apply a distinction between a defect in design and a defect in materials or workmanship at the pleadings stage of litigation."); *McCarthy v. Toyota Motor Corporation*, 2018 WL 6318841, at *8 (C.D. Cal. Sept. 14, 2018) ("The Court cannot conclude at this stage whether the [alleged defect] is the result of defective design, workmanship, materials, or manufacture, and thus the Court cannot determine whether the

17

warranty, as alleged, covers [the defect]. These are issues that 'are better dealt with at the summary judgment stage.'").

c.   **Whether GM Breached the New Vehicle Limited Warranty**

GM argues that it did not breach the limited warranty because it found a solution for the alleged defect on October 3, 2018, ECF No. 21-2 at 8, approximately two and a half months after Napoli-Bosse first presented her vehicle to GM for repair. GM has also produced service records indicating that the defect in Napoli-Bosse's vehicle was repaired on October 11, 2018. ECF No. 21-2 at 19-20. Setting aside whether these facts—which do not appear in the Amended Complaint—are cognizable at this stage, even assuming that GM was prepared to fully repair the alleged defect on October 3, 2018, and did repair Napoli-Bosse's vehicle on October 11, 2018, I cannot conclude as a matter of law that this satisfied GM's obligation under its New Vehicle Limited Warranty to repair defects within a "reasonable time."

GM suggests that because the defect was no more than a "minor inconvenience," ECF No. 21-1 at 8, and did not represent a safety risk, *id.* at 19, a two-and-a-half-month delay was reasonable as a matter of law. But accepting all factual allegations as true and drawing all reasonable inferences in Napoli-Bosse's favor, I find that the alleged defect presented more than a "minor inconvenience." Napoli-Bosse alleges that, as a result of the defect, she has been stranded inside her vehicle, away from home, unable to shut it off or lock it, and understandably unwilling to leave it unattended while unlocked and running. Am. Compl. ¶ 49. She also alleges that the defect caused her to refrain from driving her vehicle for several weeks. *Id.* at ¶ 48. The inability reliably to be able to leave one's vehicle upon reaching a destination is more than a "minor inconvenience," and, if it happens often, can render a vehicle nearly unusable. Nor does

the fact that the defect did not create any apparent risk of bodily injury render a two and a half month delay reasonable as a matter of law.

GM argues that Napoli-Bosse only had to "wiggle the shifter and push the stop/start button" to get the vehicle to recognize it was in park and allow her to shut it off. ECF No. 21-1 at 8. But Napoli-Bosse characterizes this workaround as less straightforward and reliable. *See* Am. Compl. ¶ 50 ("To shut her vehicle off, Napoli-Bosse was forced to continuously wiggle the shifter, repeatedly move the shifter from 'Park' to other gear positions and back to 'Park,' and repeatedly start the vehicle's engine and shut it off until her vehicle would recognize it was in 'Park.'"). It is unclear from the Amended Complaint and the parties' briefs (1) what degree of effort the workaround required, (2) whether the workaround reliably allowed Napoli-Bosse to turn off her vehicle, and (3) whether and when Napoli-Bosse learned of or received clear instructions regarding this workaround. Whether the roughly two and a half months it took GM to repair the alleged defect was "reasonable" depends on these and other factual questions that the Court cannot resolve on a motion to dismiss.

GM cites *Hines v. Mercedes-Benz USA, LLC*, 358 F. Supp. 2d 1222 (N.D. Ga. 2005), but that case was decided on a motion for summary judgment, with the benefit of a full record. Even then, the Court acknowledged that whether a repair was made within a reasonable period of time is usually a question for the finder of fact. *See id.* at 1231 ("Although this Court has found no Georgia cases discussing what constitutes a 'reasonable' time for the completion of repairs, Georgia courts have held that such questions of reasonableness 'usually remain most appropriate for the jury.'" (quoting *Hightower v. GM Corp.*, 175 Ga. App. 112, 114 (1985)).

19

In short, accepting all of her allegation as true, and drawing all reasonable inferences in her favor, I find that Napoli-Bosse has plausibly alleged that GM failed to repair the alleged defect within a "reasonable time."[8]

## IV. CONCLUSION

For the reasons set forth above, GM's motion to dismiss for lack of personal jurisdiction is GRANTED. The claims of Plaintiffs Brandy Smith, Rilla Jefferson, and Mark Riley are DISMISSED. The claims of Plaintiff Samuel Taylor have been withdrawn and are thus also DISMISSED. GM's motion to dismiss for failure to state a claim is GRANTED as to Napoli-Bosse's breach of express warranty claim and Magnuson-Moss Warranty Act claim, and DENIED as to Napoli-Bosse's breach of contract claim.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:   Hartford, Connecticut
         April 6, 2020

---

[8] GM also argues that Napoli-Bosse's breach of contract claim is duplicative of her breach of express warranty claim. But the Federal Rules of Civil Procedure explicitly permit pleading claims in the alternative. Fed. R. Civ. P. 8(a) ("a demand for the relief sought . . . may include relief in the alternative or different types of relief"). Here, the breach of contract and breach of express warranty claims are legally distinct. The latter requires a plaintiff to show, for example, the existence of an express warranty—a requirement Napoli-Bosse has failed to satisfy, as discussed above. To dismiss Napoli-Bosse's breach of contract claim as duplicative in these circumstances would be inappropriate.