UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARLAINA A. NAPOLI-BOSSE,<br>*Plaintiff*,<br>v.<br>GENERAL MOTORS LLC,<br>*Defendant*. | No. 3:18-cv-1720 (MPS) |

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

**I.    INTRODUCTION**

Plaintiff Marlaina Napoli-Bosse ("Plaintiff" or "Napoli-Bosse"), a resident of Connecticut, asserts a breach of contract claim against General Motors LLC ("Defendant" or "GM") alleging that it breached its promises to address a problem with the shifter of her leased 2017 GMC Acadia that prevented her from reliably being able to turn off the vehicle. Before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, GM's motion for summary judgment is GRANTED and Napoli-Bosse's motion for summary judgment is DENIED.

**II.   BACKGROUND**

**A.    Procedural History**

Napoli-Bosse, along with three other out-of-state plaintiffs, filed the operative complaint in this case on January 11, 2019, raising claims of breach of contract, breach of express warranty under Connecticut law, and breach of warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (the "MMWA") against GM. *See* ECF No. 16 ("Am. Compl.").

After GM moved to dismiss, this Court dismissed the claims of the three out-of-state plaintiffs for lack of personal jurisdiction and dismissed the breach of express warranty and

MWWA claims under Fed. R. Civ. P. 12(b)(6) but determined that Napoli-Bosse could proceed with her breach of contract claim. *See* ECF No. 27.

The parties cross-moved for summary judgment on the breach of contract claim, *see* ECF Nos. 70 and 77, and the Court held oral argument on August 19, 2022 on the motions and on the plaintiff's motion for class certification.

**B.     Facts[1]**

**1.     The Lease Agreement and New Vehicle Limited Warranty**

On February 27, 2017, Plaintiff Marlaina Napoli-Bosse leased a new 2017 GMC Acadia (the "vehicle") from Stephen Cadillac GMC, Inc. ("Stephen GMC"), a GM dealership in Bristol, Connecticut. ECF No. 89-1 at ¶ 1; ECF No. 92-1 at ¶ 4. The lease for the vehicle expired on May 27, 2020. ECF No. 92-1 at ¶ 6. Stephen GMC informed Napoli-Bosse that the vehicle came with GM's New Vehicle Limited Warranty ("Limited Warranty") and provided her with a copy of the warranty. ECF No. 89-1 at ¶ 2; *see also* ECF No. 92-1 at ¶¶ 7-8. In relevant part, the Limited Warranty stated:

> GMC will provide for repairs to the vehicle during the warranty period in accordance with the following terms, conditions, and limitations.
>
> **Warranty Applies**
>
> This warranty is for GMC vehicles registered in the United States and normally operated in the United States and is provided to the original and any subsequent owners of the vehicle during the warranty period.
>
> **Repairs Covered**

---

[1] The facts in this section are drawn from the undisputed portions of the parties' Local Rule 56(a) statements ("General Motors LLC's Local Rule 56(a)(1) Statement of Undisputed Material Facts in Support of Motion for Summary Judgment" (ECF No. 72); Plaintiff's "Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment" (ECF No. 92-1); Plaintiff's "Local Rule 56(a)1 Statement of Undisputed Material Facts" (ECF No. 77-1); and "General Motors LLC's Response to [Plaintiff's] Statement of Undisputed Material Facts and GM's Statement of Additional Facts" (ECF No. 89-1)) unless otherwise indicated.

> The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

* * *

> **Obtaining Repairs**
>
> To obtain warranty repairs, take the vehicle to a GMC dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

ECF No 92-1 at ¶ 10.

From February 27, 2017 (the date she leased the vehicle) to around July 20, 2018, Napoli-Bosse, the primary user of the vehicle, ECF No. 89-1 at ¶ 6, drove it without experiencing any issues. ECF No. 92-1 at ¶ 11.

**2.     Napoli-Bosse Encounters the Shift-to-Park Defect[2]**

On July 20, 2018, after she had driven her child to daycare and placed the vehicle's shifter in the "park" position, ECF No. 89-1 at ¶ 13, Napoli-Bosse noticed a message on the vehicle's instrument panel "indicating that the vehicle needed to be shifted into park even though the vehicle was already in park." ECF 92-1 at ¶ 12; *see also* ECF No. 89-1 at ¶ 13. Napoli-Bosse attempted, and ultimately failed, to shut off the vehicle by pressing the on/off button. ECF Nos. 92-1 at ¶ 12 and 89-1 at ¶ 13. Napoli-Bosse then spent several minutes shifting the car in and out of the "park" position in an effort to clear the shift-to-park message or shut off the vehicle. This was also unsuccessful, and so she exited the vehicle while it was still running to drop her child off. ECF No. 89-1 at ¶ 14.

---

[2] Although GM objects to the term "defect," *see, e.g.*, ECF No. 89-1 at ¶ 8, the Court uses that term because, for the reasons set forth herein, it grants GM's motion, and before doing so it must construe the evidence in the light most favorable to Napoli-Bosse.

After returning to her still-running vehicle, Napoli-Bosse called Stephen GMC to report that her car wouldn't shut off, and the dealership instructed Napoli-Bosse to bring the car in. ECF No. 89-1 at ¶ 15.  Napoli-Bosse drove the vehicle to Stephen GMC that day and described the issue to someone at the dealership.  ECF No. 89-1 at ¶¶ 16-17.  A service advisor came out to the vehicle, got in, and drove the vehicle backwards and forwards several times—shifting to "park" intermittently—until the car shut off.  ECF No. 89-1 at ¶ 17.  The service advisor then advised Napoli-Bosse to shift the car in and out of the "park" position until it shut off in the event the issue occurred again.  ECF Nos. 89-1 at ¶ 18 and 92-1 at ¶ 13.  In response to Napoli-Bosse's request that day for a repair and for paperwork documenting her request for a repair, the service advisor informed Napoli-Bosse that the shifter problem she was experiencing was a "known issue," but that there was no known fix for it.  ECF No. 89-1 at ¶ 19; *see also* ECF No. 92-1 at ¶ 13.  Napoli-Bosse then drove home in the vehicle and was able to turn it off only after "'shifting it in and out of park several times.'"  ECF No. 89-1 at ¶ 20.

After returning home from Stephen GMC on July 20, 2018, Napoli-Bosse called GM to inform the company of the shift-to-park issue she was experiencing, that she had taken the vehicle to the dealership that day to have the issue repaired "but the dealer did not attempt a repair or give her a repair order," and that "she did not feel safe driving her car."  ECF No. 89-1 at ¶ 25.  Napoli-Bosse and her husband ceased driving the vehicle from July 20, 2018 until late August 2018 because Napoli-Bosse did not think she could safely drive the unrepaired vehicle. ECF Nos. 89-1 at ¶ 30 and 92-1 at ¶ 15.

On July 24, 2018, a GM representative informed Napoli-Bosse that "there is no resolution at this time" and that "engineering is aware of this issue.  ECF No. 78-10 (Exhibit 12).

4

On or around July 25, 2018, during a visit to Stephen GMC to bring her husband's vehicle in for servicing, Napoli-Bosse again raised the issue with the dealership and was again told there was not yet a repair for it. ECF No. 89-1 at ¶ 27. Between July 26, 2018 and July 30, 2018, Napoli-Bosse contacted GM via phone and email requesting an update regarding a repair "and to determine whether GM could provide [her] with some type of alternative relief given that GM had no repair." ECF No. 89-1 at ¶ 28. "GM declined to provide Plaintiff with any accommodations or relief, such as a rental vehicle, while her vehicle remained unrepaired." ECF No. 89-1 at ¶ 29. From July 20 to August 8, 2018, Napoli-Bosse drove her husband's car while her husband drove his work vehicle. ECF No. 92-1 at ¶ 15.

Napoli-Bosse and her husband resumed driving the vehicle "sometime in August 2018." ECF No. 92-1 at ¶ 18. The two "experienced the [shift-to-park] [d]efect nearly every time they drove" the vehicle between August 2018 and October 2018. ECF No. 89-1 at ¶ 32. To work around the defect, which prevented the vehicle from being turned off or locked, Napoli-Bosse and her husband would have to shift the car "in and out of park, jiggle the shifter, bang on the shifter, anything that might get it to turn off the error message and shut off" or "play around with the shifter and roll the vehicle forward, backwards, restart it, re-shut it off to get it to go off." ECF No. 89-1 at ¶ 33 (internal citations and quotation marks omitted). Because there was no failsafe method to turn the vehicle off when it experienced the defect, Napoli-Bosse and her husband would have to experiment with these various methods each time. ECF No. 89-1 at ¶ 35. It could take as long as three to five minutes "of constant attempts to turn the [vehicle] off when it experienced the [shift-to-park] [d]efect." ECF No. 89-1 at ¶ 34.

3.     **The Shift-to-Park Defect**

The parties dispute when, exactly, GM learned of the shift-to-park defect, *compare* ECF No. 92-1 at ¶ 5 ("By November 2015, GM had begun receiving Shift to Park complaints and warranty data regarding 2016 vehicles that share the same shifter assembly as the 2017-2018 Acadia Class Vehicles.") *with* ECF No. 89-1 at ¶ 45 ("GM admits that it had received some complaints concerning the shift to park issue on other GM vehicles that share the same shifter assembly as the Class Vehicles but did not know, as of this time, that the issue with [the] shifter on Class Vehicles was the same issue experienced by other GM vehicles."). They do agree, however, that by November 2017, GM "began experiencing an increase in repairs in the 2017 GMC Acadia vehicle," although GM denies that all of these repairs were attributable to the shift-to-park defect. ECF No. 89-1 ¶ 49. The parties also agree that approximately two months prior to Napoli-Bosse's July 20, 2018 visit to Stephen GMC (on May 29, 2018), GM had issued Preliminary Information Bulletin No. PIT5616 ("PIT5616"), which provided "service information" to dealers regarding the shift-to-park defect. ECF No. 89-1 at ¶¶ 21-22. One suggested correction in PIT5616 was to replace the vehicle's shifter. *Id.* at ¶ 22.

The parties also dispute how many vehicles were affected by this issue. *See, e.g.*, ECF No. 89-1 at 3-4. But it is undisputed that at least some 2017-2018 GMC Acadia vehicles "contain shifter assemblies that fail to recognize that the vehicles have been placed in park, erroneously direct the driver to 'Shift to Park,' and prevent the vehicle from turning off." ECF No. 89-1 at ¶ 8. Plaintiff's expert Darren Manzari opined that "[o]ver one hundred thousand [vehicles] have experienced a defect whereby a 'Shift to Park' message appears on the vehicle's instrument cluster directing the driver to shift their [*sic*] vehicle to park despite the [fact that the] vehicle is already in park." ECF No. 92-1 at ¶ 28.

After launching an investigation into the shift-to-park defect in August 2017, ECF No. 89-1 at ¶ 56, GM was able to confirm the cause of the issue in August 2018. ECF No. 89-1 at ¶ 50. The parties agree that the shift-to-park issue

> is the result of a defect whereby silicon dioxide or glass ("SIO") builds up on the park switch contacts in the Class Vehicles' shifter assemblies, which causes the Class Vehicles to fail to recognize when their transmissions have been placed in the park position and prevents the vehicles shutting off. SIO or glass builds up over time because '[t]he park switch has organic silicon within the switch at some point. And through the actions of the switch opening and closing, that organic silicon is decomposed into its base elements and the organic silicon will immediately reform in the presence of heat into silicon dioxides and attach itself to the surfaces of the switch contacts.'

ECF No. 89-1 at ¶¶ 9-10; *see also* ECF No. 92-1 at ¶ 31.

While the parties do not agree on the exact length of time it takes for the shift-to-park issue to manifest, they do agree that it "typically does not manifest until the vehicle has been driven for more than one year." ECF No. 89-1 at 12.

GM admits that "The Class Vehicles' shifter assemblies are 'not an expected maintenance item' and absent any defects, GM expects that shifter assemblies should last the 'life of the vehicle.'" ECF No. 89-1 at ¶ 7.

**4.      The Shifter is Replaced, and the Vehicle is Returned**

When Napoli-Bosse brought the vehicle back to Stephen GMC on October 11, 2018 for "routine maintenance," she complained to the dealer that she was still experiencing the shift-to-park defect. ECF No. 89-1 at ¶ 38. In response, "the dealer attempted a repair by replacing Plaintiff's shifter assembly." ECF No. 89-1 at ¶ 38; *see also* ECF No. 92-1 at ¶ 21. Napoli-Bosse did not have to pay for this repair. ECF No. 92-1 at ¶ 22. "After the shifter assembly was replaced on October 11, 2018, Napoli-Bosse continued to drive the vehicle and did not experience any issues with the shifter." ECF No. 92-1 at ¶ 24. "When the lease for the [vehicle]

7

expired on May 27, 2020, Napoli-Bosse returned the vehicle to Stephen GMC." ECF No. 92-1 at ¶ 25.

## III.     LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). "When both parties have moved for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (internal quotation marks omitted).

## IV.     DISCUSSION

The Court first considers GM's motion for summary judgment and will therefore view the record in the light most favorable to Napoli-Bosse and draw all reasonable inferences in her favor. *See, e.g.*, *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).

GM argues that Napoli-Bosse's breach of contract claim cannot be sustained for three reasons: (1) there is no privity of contract between the parties; (2) if a contract was formed between the parties, there was no breach based on the coverage provided by the Limited Warranty; and (3) there is insufficient evidence of damages. *See* ECF No. 71 at 7-8. In response, Napoli-Bosse contends that (1) her breach of contract claim qualifies for an exception to the privity requirement for third-party beneficiaries; (2) GM breached its contractual

8

obligations to Napoli-Bosse because it failed to repair or replace the defect and the defect is of a type covered by the Limited Warranty; and (3) there is sufficient evidence of damages in the record.  *See* ECF No. 92 at 7-8.  Because Napoli-Bosse has introduced no evidence to suggest privity of contract between the parties and has failed to allege or support a third-party beneficiary theory, the Court grants summary judgment in favor of GM on Napoli-Bosse's breach of contract claim.

The parties agree that Connecticut law applies to Napoli-Bosse's claim.  *See* ECF No. 71 at 13; ECF No. 78 at 21-22.  In Connecticut, "[t]he elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages."  *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly*, P.C., 311 Conn. 282, 291, 87 A.3d 534, 540 (2014).

As GM notes, "Napoli-Bosse leased the [vehicle] from and entered into a lease agreement with Stephen GMC, not GM."  ECF No. 71 at 14.  Napoli-Bosse does not dispute these facts or suggest that GM was somehow a party to her lease with Stephen GMC.  Neither does she contest that "only parties to contracts are liable for their breach."  *FCM Grp., Inc. v. Miller*, 300 Conn. 774, 797, 17 A.3d 40, 54 (2011); *see also Szynkowicz v. Bonauito-O'Hara*, 170 Conn. App. 213, 224, 154 A.3d 61, 69 (2017) ("The plaintiff's breach of contract and breach of the covenant of good faith and fair dealing counts indisputably rest on the allegation that the defendant was a party to the dual agency agreement to create the required privity of contract.") (citing cases); *Lin v. W & D Assocs. LLC*, No. 3:14-CV-164 (VAB), 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015) ("Privity is required to maintain a cause of action for breach of contract and for any other claims that arise from that contract.").  Instead, Napoli-Bosse argues that she may recover against GM under the New Vehicle Limited Warranty offered by GM and provided to her by

9

Stephen GMC because she is an "intended beneficiary" of that document, which she contends is a contract. ECF No. 91 at 9. *See Loud v. Cimmino*, No. CV095011214S, 2010 WL 1224378, at *5 (Conn. Super. Ct. Feb. 22, 2010) ("In the absence of privity, if the plaintiff could establish that he is a third-party beneficiary to the contract, then conceivably his breach of contract claim could stand."). According to Napoli-Bosse, "the plain language of GM's New Vehicle Limited Warranty[] makes clear that GM, as the promisor, assumed a direct obligation to Plaintiff, i.e., GM's promise to provide repairs to Plaintiff's vehicle during the warranty period." ECF No. 93 at 10. The terms of the warranty, she argues, indicate that "GM made contractual promises in its warranty to repair Plaintiff's vehicle, which were specifically intended to benefit Plaintiff, as one of the 'owners of the vehicle during the warranty period,' and thus Plaintiff is an intended third-party beneficiary of the warranty and has standing to bring her breach of contract claim." *Id.* at 11.

Under Connecticut law, "[a] third-party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract." *Santiago v. Colon*, No. CV 970138980, 1998 WL 309792, at *1 (Conn. Super. Ct. June 3, 1998). "The ultimate test to be applied in determining whether a person has a right of action as a third party beneficiary is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party beneficiary[.]" *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 266 Conn. 572, 580, 833 A.2d 908, 914 (2003) (cleaned up).

Napoli-Bosse's third-party beneficiary theory cannot save her breach of contract claim for three reasons. First, Napoli-Bosse did not plead a third-party beneficiary theory in her complaint and is therefore precluded from raising it for the first time in her brief in opposition to summary judgment. *See, e.g.*, *Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 32

10

(2d Cir. 2018) (finding that "the district court did not abuse its discretion in refusing to consider the merits of [the plaintiff's] third-party beneficiary theory of liability" raised for the first time in its opposition to summary judgment); *Allen v. Verizon Wireless*, No. 3:12-CV-00482 JCH, 2013 WL 5776197, at *1 (D. Conn. Oct. 25, 2013) (dismissing plaintiffs' third-party beneficiary claims where the operative complaint failed to plausibly allege that the defendant "intended to assume a direct obligation to [the plaintiffs]"); *Santiago v. Colon*, No. CV 970138980, 1998 WL 309792, at *1 (Conn. Super. Ct. June 3, 1998) (declining to consider plaintiff's third-party beneficiary theory where no supporting allegations were raised in the complaint). At oral argument, Napoli-Bosse cited *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991), in which the Second Circuit rejected the defendant's argument that a plaintiff could not advance a third-party beneficiary theory not pled in the complaint, stating that "federal pleading is by statement of claim, not by legal theory." In a later decision, however, the Supreme Court made clear that federal pleading requires a plaintiff to set forth factual allegations that make out a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter…to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Nowhere does the operative complaint set forth facts that make it plausible that Napoli-Bosse was a third-party beneficiary of a contract under Connecticut law. Neither the factual allegations of the complaint nor the breach of contract count describes any facts suggesting that the parties to some contract—be it the warranty or some other contract—intended that one of them assume a direct obligation to a third person who was not a party to the contract, which is the test for third-party beneficiary status under Connecticut law. *Dow & Condon, Inc.*, 266 Conn. at 580. To the

contrary, the complaint alleges that Napoli-Bosse was herself a party to a contract with GM. ECF No. 16 ¶ 106 ("In connection with the sale or lease of the Class Vehicles, the Plaintiffs and class member[s] entered into a written contract with [GM] under which [GM] agreed to repair original components found to be defective..."). The complaint does not plead any facts suggesting, and does not put GM on notice of, a third-party beneficiary claim. *See Dow & Condon, Inc.*, 266 Conn. at 580 (making clear that enforcement of a contract by a party is a distinct claim from enforcement of a contract by a third-party beneficiary under Connecticut law: "We need not consider at this point…whether those documents…created an enforceable contract because we conclude that the plaintiff was an intended third party beneficiary under the commission agreement and therefore had rights under the agreement sufficient to confer standing to bring this action.").

Second, Napoli-Bosse cites no Connecticut law recognizing a third-party beneficiary theory in circumstances similar to this case; indeed, to the extent Connecticut courts have addressed breach of contract claims brought by consumers against car manufacturers, they have required privity. *See, e.g.*, *Ossolinski v. Ford Motor Co.*, No. LLICV126006285S, 2014 WL 4638171, at *7 (Conn. Super. Ct. Aug. 12, 2014) (dismissing plaintiffs' breach of contract claim where "there was no evidence of a contract between the plaintiffs and [the defendant-manufacturer]").

Third, the third-party beneficiary claim Napoli-Bosse presses does not square with the basic principles of Connecticut third-party beneficiary law. Napoli-Bosse's claim posits that GM's warranty is the contract of which she is a third-party beneficiary. She does not identify, however, the two (or more) parties to that contract who mutually intended that one of them assume a direct obligation to her. Under Connecticut law, "the only way a contract could create

12

a direct obligation between a promisor and a third party beneficiary would have to be, under our rule, because the *parties* to the contract so intended." *Dow & Condon, Inc.*, 266 Conn. at 580–81 (emphasis added); *see also id.* at 581 ("The requirement that both contracting parties must intend to confer enforceable rights in a third party rests, in part at least, on the policy of certainty in enforcing contracts. That is, each party to a contract is entitled to know the scope of his or her obligations thereunder. That necessarily includes the range of potential third persons who may enforce the terms of the contract.") (internal quotation marks omitted). Napoli-Bosse never identifies in her brief who the parties to the contract comprising the warranty might be. When pressed on this point at oral argument, Napoli-Bosse's counsel suggested that the parties to the contract were GM and Stephen GMC, although counsel conceded that this was not a "natural" reading of the warranty. It is not even a permissible reading of the warranty. The warranty confers no rights and imposes no obligations on Stephen GMC, and it is difficult to see what consideration Stephen GMC gave or received for the warranty. *See generally* ECF No. 73-3. While the warranty occasionally mentions the dealer—for example, as the place the owner of the vehicle should take the vehicle for repairs, *see id.* at 7—it does not itself command or require the dealer to do anything. Nothing in the warranty suggests that it is a contract between GM and Stephen GMC.

      Napoli-Bosse also argues that dismissing her breach of contract claim on privity grounds would leave her without a remedy and therefore dismissal isn't warranted. *See* ECF No. 92 at 13 n. 5; 14 n. 8. The Court disagrees. Although breach of contract is now her last remaining claim, Napoli-Bosse has not shown that she lacked any alternative remedies against GM when she brought this lawsuit.

13

Connecticut courts have allowed plaintiffs who are not in privity to recover from a manufacturer in some circumstances. For example, they have recognized an exception to the privity requirement where an agency relationship exists between the vehicle manufacturer and the dealer. *See, e.g., Kahn v. Volkswagen of Am., Inc.*, No. FSTCV075004090S, 2008 WL 590469, at *8 (Conn. Super. Ct. Feb. 13, 2008) ("Courts applying Connecticut law have also recognized that it may be possible to satisfy the privity requirement by pleading facts which establish an agency relationship between a vehicle manufacturer and the [d]ealership."); *Koellmer v. Chrysler Motors Corporation*, 6 Conn. Cir. 478, 485, 276 A.2d 807 (Conn. Cir. App. Div. 1971) (upholding directed verdict for Chrysler on breach of implied warranty claim where plaintiff failed to show dealer was its agent). According to the Connecticut Supreme Court, "the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Wesley v. Schaller Subaru, Inc.*, 277 Conn. 526, 543, 893 A.2d 389 (2006). But Napoli-Bosse does not make any effort to satisfy these elements and does not argue that there was an agency relationship between Stephen GMC and GM from which privity can be inferred.

In addition, Connecticut's "Lemon Law" (Conn. Gen. Stat. § 42-179 *et seq.*) allows consumers like Napoli-Bosse to seek relief directly from manufacturers like GM, and Connecticut courts have found that the statute authorizes both a private right of action and an arbitration alternative through the Connecticut Department of Consumer Protection. *See, e.g.*, *Kahn v. Volkswagen of Am., Inc.*, No. FSTCV075004090S, 2008 WL 590469, at *2-7 (Conn. Super. Ct. Feb. 13, 2008). The Lemon Law allows for the recovery of attorneys' fees. Conn.

14

Gen. Stat. § 42-180. Further, the Lemon Law makes a breach of the manufacturer's warranty an unfair trade practice, permitting consumers to bring a Connecticut Unfair Trade Practices Act claim for such a breach. *See* Conn. Gen. Stat. § 42-184; *see also* Conn. Gen. Stat. § 42-110g (authorizing damages action, recovery of attorneys' fees, and class actions). Napoli-Bosse chose not to assert a Lemon Law claim in this case.[3]

Further, although this does not help Napoli-Bosse, who alleges only commercial loss, Connecticut courts have also carved out an exception to the privity requirement in personal injury cases.[4] *See, e.g., Quadrini v. Sikorsky Aircraft Div.*, 505 F.Supp. 1049, 1050 (D. Conn. 1981) ("Connecticut courts since *Hamon v. Digliani*, 148 Conn. 710, 174 A.2d 294 (1961) have recognized a tortious breach of warranty claim which does not require a privity relationship."). Specifically, in breach of warranty cases involving personal injury rather than purely commercial

---

[3] Although Napoli-Bosse ultimately did not bring a Lemon Law claim in this case, her August 9, 2018 demand letter threatened to do so. *See* ECF No. 23-2 at 2. When asked about a Lemon Law claim at oral argument, Napoli-Bosse's counsel stated that it would have been very difficult to bring such a claim on her behalf, although he was not clear about the reasons for this assessment. Napoli-Bosse's vehicle fell within both the time and mileage limits specified in the Lemon Law. *See* Conn. Gen. Stat. § 42-179 (requiring manufacturer to repair any nonconformity reported within the earlier of two years after delivery or 24,000 miles); ECF No. 16 ¶¶ 39, 45 (Napoli-Bosse reported shifter defect 17 months after delivery), ECF No. 78-1 ¶ 38 (vehicle had 20,558 miles on it three months after defect was reported). Although counsel mentioned that his client may not have attempted to get the vehicle repaired enough times to qualify under the Lemon Law, the Law does not bar claims unless the manufacturer or dealer has received no opportunity to attempt a repair. Conn. Gen. Stat. § 42-179(c), and the undisputed facts here show that Napoli-Bosse gave the dealer and GM multiple opportunities to attempt a repair.

[4] Outside the Lemon Law and agency contexts, the only case the Court has found in which a court applying Connecticut law has permitted breach-of-warranty-type claims involving only commercial loss to be asserted by a party not in privity is *Utica Mutual Ins. Co. v. Denwat Corp.*, 778 F.Supp. 592 (D.Conn.1991). In *Utica*, a subrogation case in which the plaintiff raised a breach of warranty claim (not a breach of contract claim) alleging only economic loss, the court allowed the plaintiff to proceed with their claim "despite the lack of privity" because the plaintiff would have been "without a cause of action to recover" for its losses otherwise. *Id.* at 594-96. Connecticut trial courts have read *Utica* narrowly, however, or declined to follow it. *See, e.g.*, *United Technologies Corp. v. Saren Eng'g, Inc.*, No. X06CV020173135S, 2002 WL 31319598, at *3-4 (Conn. Super. Ct. Sept. 25, 2002) (treating *Utica* as a case involving a "a subrogation claim for a commercial entity *that was in privity with the defendant manufacturer*," despite the absence in the *Utica* opinion of any language justifying that restrictive reading; and noting that although the result of interpreting the UCC warranty provisions to impose a privity requirement "is that a plaintiff may be left without a remedy for its commercial losses," "[t]hat result…is not grounds for extending the exception to the UCC privity requirement.") (emphasis in original); *Hartford Cas. Ins. Co. v. PureTech Waters of Am., LLC*, No. CV116021419S, 2012 WL 1435221, at *3-4 (Conn. Super. Ct. Mar. 30, 2012) (same). In any event, as shown, Napoli-Bosse had alternative remedies in this case at the time she brought this lawsuit.

15

loss—in other words, "[w]here the liability is fundamentally founded on tort rather than contract"—Connecticut courts have found that "there appears no sound reason why the manufacturer should e[s]cape liability simply because the injured user, a party in the normal chain of distribution, was not in contractual privity with it by purchase and sale." *Garthwait v. Burgio*, 153 Conn. 284, 289, 216 A.2d 189, 192 (1965) (citing *Hamon v. Digliani*, 148 Conn. 710, 174 A.2d 294 (1961)); *see also* Conn. Gen. Stat. § 42a-2-318 (For UCC claims, "[a] seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of warranty.").[5]

      Thus, granting summary judgment on Napoli-Bosse's breach of contract claim would not foreclose all remedies against GM for purchasers or lessees of GM vehicles. Because Napoli-Bosse has not demonstrated the existence of contractual privity between herself and GM and because her third-party beneficiary theory fails, the Court grants GM's motion for summary judgment. And because Napoli-Bosse's own motion for summary judgment likewise depends on her failed third-party beneficiary theory, *see* ECF No. 97 at 5 (arguing that "[p]rivity of contract does not bar Plaintiff's breach of contract claim" because "Plaintiff is an intended third-party beneficiary of the warranty contract…"), the Court denies that motion for the reasons just discussed.

---

[5] Connecticut courts also require privity for breach of express and implied warranty claims seeking commercial loss. *Fraiser v. Stanley Black & Decker, Inc.*, 109 F. Supp. 3d 498, 506 (D. Conn. 2015) ("[P]arties seeking to state a claim for breach of express warranty for economic losses…still have to establish privity."); *Hartford Cas. Ins. Co. v. PureTech Waters of Am., LLC*, 2012 WL at *3-4 (finding that privity is required for breach of express and implied warranty claims where commercial loss is alleged). Napoli-Bosse did not assert a breach of implied warranty claim under Connecticut law in this case, but she did assert a breach of express warranty claim. *See* ECF No. 16 ("Amended Complaint") at ¶¶ 120-28. The Court dismissed that claim earlier on other grounds, *see* ECF No. 27 at 10-14, but notes that the lack of privity constitutes an independent and fatal flaw in that claim as well.

## V. CONCLUSION

For the foregoing reasons, GM's motion for summary judgment is GRANTED and Napoli-Bosse's motion for summary judgment is DENIED.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
              August 22, 2022